IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| WILLIAM S. NICHOLS, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | Civil Action No. 3:10-CV-0651-G-BF |
| § | |
| COMMISSIONER OF SOCIAL § | |
| SECURITY ADMINISTRATION, § | |
| § | |
| Defendant. § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

The District Court referred this matter to the United States Magistrate Judge for findings and recommendation. William S. Nichols ("Plaintiff") appeals the decision of the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") denying his claims for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act") and for Supplemental Security Income ("SSI") under Title XVI of the Act. The Court has considered Plaintiff's Brief, filed July 16, 2010, Defendant's Brief, filed August 13, 2010, and Plaintiff's Reply Brief, filed August 27, 2010. The Court has reviewed the parties' evidence in connection with the pleadings and hereby recommends that the Commissioner's decision be REVERSED and REMANDED for reconsideration in line with this opinion.

**I. BACKGROUND[1]**

*A. Procedural History*

Plaintiff filed applications for DIB and SSI on October 26, 2005, claiming a disability onset date of September 20, 2005. (Tr. 88-91; 132-37.) In his applications, Plaintiff alleged disability due

---
[1] The following history comes from the transcript of the administrative proceedings, which is designated as "Tr."

to bipolar II disorder, borderline intellectual functioning, and the combined effects of a variety of behavioral problems. (Tr. 67-68.) Plaintiff's application was denied both initially and upon reconsideration. (Tr. 88-91.) Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 106.) The ALJ conducted the *de novo* administrative hearing in Dallas, Texas on August 14, 2008. (Tr. 39.) Plaintiff appeared at the hearing with a representative and testified. (Tr. 39.) A vocational expert ("VE") also testified. (Tr. 51.)

On September 4, 2008, the ALJ issued his decision finding Plaintiff "not disabled." (Tr. 9.) Plaintiff requested and was denied review of the ALJ's decision by the Appeals Council. (Tr. 3; 8.) After receiving a thirty day extension, Plaintiff filed this case seeking judicial review of the administrative proceedings pursuant to 42 U.S.C. § 405(g). (Tr. 1.) This matter is ripe for consideration on the merits.

### B. *Factual History*

#### 1. Plaintiff's Age, Education, and Work Experience

Plaintiff's date of birth is November 8, 1975. (Tr. 54.) Plaintiff completed eight years of school, did not complete high school, and has not obtained a GED. (Tr. 56.) He has no other specialized training or education. (Tr. 56.) At the time of the hearing, Plaintiff was thirty-two years old and had worked as a store laborer and janitor. (Tr. 55.)

#### 2. Plaintiff's Medical Evidence

On September 22, 2005, Plaintiff visited a counselor at Life Path Systems ("LPS"). (Tr. 217.) The counselor noted that Plaintiff was negative for psychoses and had no suicidal ideations. (Tr. 217.) He assessed Plaintiff with bipolar type II disorder and continued Byrmima, Prozac, Lithium, and Thiazolidinedione medications. (Tr. 217.)

On October 17, 2005, Plaintiff visited Robert Karp, M.D., for a psychological intake evaluation. (Tr. 271.) Dr. Karp observed that Plaintiff had a shallow euthymic mood; no abnormal affect; no suicidal or homicidal ideations, hallucinations, or overt psychotic thoughts; and no formal thought disorder. (Tr. 271.) Dr. Karp assessed Plaintiff with schizo-affective disorder and bipolar disorder. (Tr. 271.) He further noted that Plaintiff had no prior psychiatric evaluations but was taking Lithium and multiple antidepressants. (Tr. 271.) Dr. Karp prescribed Lithium and Wellbutrin to Plaintiff and discontinued prescriptions for Fluoxetine and Trazodone. (Tr. 271.) Dr. Karp advised Plaintiff to seek a psychiatric re-evaluation and to discuss a treatment plan with a psychiatrist. (Tr. 271.) On December 12, 2005, Plaintiff enrolled in a six-month mental health treatment plan at LPS to overcome barriers to achieving his life goals and to address his financial issues. (Tr. 285.)

On December 22, 2005, Plaintiff returned to LPS for a follow-up. (Tr. 212.) The attending physician performed a mental status examination, which revealed negative results for psychoses and suicidal ideations. (Tr. 212.) The attending physician assessed Plaintiff with bipolar II disorder and depression. (Tr. 212.) He continued Plaintiff's Prozac and Lithium medications and advised Plaintiff to not take Wellbutrin after 2:00 P.M. (Tr. 212.) In addition, Plaintiff saw an attending physician at Collin County MHMR Center ("MHMR"). (Tr. 264.) The attending physician noted that Plaintiff was taking Lithium, Thiazolidinedione, Wellbuturin, and Prozac. (Tr. 264.)

On January 5, 2006, Plaintiff returned to LPS with complaints of being disrespected by his employer. (Tr. 307.) The counselor "brainstormed" ideas with Plaintiff to improve his interactions at work. (Tr. 307.)

On February 8, 2006, an LPS attending physician saw Plaintiff for a follow-up mental status examination, which revealed a quiet and withdrawn affect, "ok" mood, and negative results for

3

suicidal ideations or delusional thoughts. (Tr. 304.) The attending physician assessed Plaintiff with bipolar II disorder and continued his current medications. (Tr. 304.) He also advised Plaintiff to undergo cognitive behavioral therapy for social anxiety. (Tr. 304.) On February 15, 2006, Plaintiff returned to LPS with complaints of feeling lonely. (Tr. 303.) The counselor educated Plaintiff about the cycles of depression. (Tr. 303.)

On February 22, 2006, Plaintiff visited Christina N. Ryser, Ph.D., for a psychological evaluation. (Tr. 316.) Dr. Ryser noted no evidence of formal thought disorder, no current suicidal ideations, obsessive thoughts or delusional thinking, and no perceptual abnormalities or hallucinations. (Tr. 319.) Dr. Ryser further noted congruent affect, with some irritability and anxiety at times, variable intelligence and general knowledge due to limited education, and variable performance with respect to abstract reasoning. (Tr. 319.) Dr. Ryser noted that Plaintiff had fairly good long-term memory, performed poorly on concentration exercises due to limited education, had variable judgment, and had poor insight. (Tr. 320.) She assessed Plaintiff with bipolar II disorder, social phobia, deferred diagnoses on Axis II, inadequate finances, past academic and job related duties, and a global assessment of functionality ("GAF") rating of 50.[2] (Tr. 321.) In addition, Dr. Ryser opined that Plaintiff was able to perform some tasks independently and that he had some problematic symptoms that appeared to limit his overall function. (Tr. 321.) Dr. Ryser's long-term prognosis of Plaintiff was guarded. (Tr. 321.)

On March 15, 2006, Plaintiff returned to LPS for an adult uniform assessment. (Tr. 284.) A counselor noted that Plaintiff had moderate functional impairment due to fluctuating sleeping patterns, impulsive behaviors, concentration difficulties, and poor memory. (Tr. 281.) The counselor

---

[2] A GAF rating of 41-50 equates to serious symptoms or serious impairments in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (American Psychiatric Ass'n., 4th ed. Text Revision 2000)(*DSM-IV*).

assessed Plaintiff with bipolar II disorder, financial difficulties, and limitations in social environment, education, and housing. (Tr. 284.) The counselor further assessed Nichols with a GAF rating of 45. (Tr. 284.)

On March 30, 2006, Plaintiff visited LPS for a group counseling session for bipolar disorder. (Tr. 296.) The counselor noted that Plaintiff had made progress in his sessions. (Tr. 296.) Subsequently, on April 3, 2006, an LPS physician saw Plaintiff and continued all of his medications. (Tr. 299.)

On April 5, 2006, Plaintiff attended a follow-up LPS counseling session. (Tr. 280.) Plaintiff reported to the counselor that he always felt better after each session. (Tr. 298.) Likewise, at an April 26, 2006 counseling session, Plaintiff reported that his social skills had improved. (Tr. 295.)

On June 16, 2006, Plaintiff enrolled in an additional three-month mental health treatment plan at LPS for his borderline intellectual functioning and lack of financial support. (Tr. 279-80.) At a June 26, 2006 LPS counseling session, Plaintiff reported he had increased his socialization with co-workers and was feeling more comfortable interacting with his co-workers. (Tr. 291.)

On August 16, 2006, Plaintiff visited a LPS physician, who reported that Plaintiff was "doing alright." (Tr. 288.) Plaintiff had a congruent mood and affect with no suicidal ideations or hallucinations. (Tr. 288.) The physician diagnosed Plaintiff with bipolar II disorder. (Tr. 288.)

On September 8, 2006, Plaintiff renewed his three-month mental health treatment plan at LPS for borderline intellectual functioning and lack of financial support. (Tr. 374-75.) Plaintiff denied suicidal or homicidal ideation or hallucinations. (Tr. 376.) A counselor assessed Plaintiff with bipolar II disorder, financial difficulties, and limitations in social environment, education, and housing. (Tr. 376.) The counselor assessed a GAF rating of 45. (Tr. 376.)

5

On December 8, 2006, an LPS counselor noted that Plaintiff had increased his interaction with co-workers and was feeling more confident in general. (Tr. 463.) From January 31 through April 4, 2007, Plaintiff attended LPS counseling sessions and reported having more overall interactions with co-workers. (Tr. 457-61.)

On June 7, 2007, Plaintiff renewed his three-month mental health treatment plan at LPS to overcome problems with financial issues. (Tr. 368-69.) From June 12 through November 30, 2007, a counselor assessed Plaintiff with bipolar II disorder and limitations in social environment, education, housing, and financial needs and a GAF rating of 45. (Tr. 361; 364; 367.)

On January 30, 2008, Plaintiff enrolled in a three-month mental health treatment plan at LPS to overcome financial issues. (Tr. 358.) From January 30 through April 16, 2008, a counselor assessed Plaintiff with bipolar II disorder, a GAF of 45, and limitations in social environment, education, occupation, access to healthcare, housing, and financial needs. (Tr. 357-59.)

From April 4 through May 29, 2008, Plaintiff attended LPS counseling sessions approximately once a week, and the counselor for each session reported that Plaintiff was able to maintain interpersonal relationships and was living well. (Tr. 379-83; 386; 388.)

On June 20, 2008, George R. Mount, Ph.D., performed a psychological evaluation of Plaintiff. (Tr. 332-38.) Dr. Mount noted normal psychomotor activity, low-average fundamental, general knowledge, depressed affect, labile mood, extremely low general memory, and low-average working memory. (Tr. 333; 336.) Dr. Mount also performed a battery of mental-status testing. (Tr. 333; 339-50.) Plaintiff's scores placed him in the severe depression range. (Tr. 334.) Dr. Mount diagnosed Plaintiff with: bipolar I disorder, most recently depressed, with psychotic features; cognitive disorder/no other symptoms; borderline intellectual functioning; psychosocial stressors;

6

and occupational problems. (Tr. 334.) He assessed Plaintiff with a GAF rating of 40.[3] (Tr. 334.) Dr. Mount also opined that Plaintiff would be marginally capable of managing disability benefits and found the prognosis guarded. (Tr. 334, 351.)

### 3. Plaintiff's Hearing

On August 14, 2008, Plaintiff testified that medications kept his bipolar disorder well-controlled, with minor sleeping problems as the only side effect. (Tr. 58.) Plaintiff further testified that he had a reading disorder and a learning disability, a history of arguing with supervisors, trouble with controlling his emotions, and difficulty in making friends because of a desire to be alone. (Tr. 56-57; 62; 64; 66.)

A medical expert reviewed the entire medical record and testified that, as of Plaintiff's alleged onset date of September 30, 2005, Plaintiff did not have impairments that met or equaled a listing for presumptive disability. (Tr. 66.) The medical expert testified that Plaintiff had an affective disorder/depression, type II bipolar disorder, borderline cognitive skills, and a basic fourth-grade cognitive ability with poor academic development. (Tr. 67.) The medical expert also stated that psychosocial support and medications that Plaintiff received from Collin County MHMR and LPS spanning 2005 to 2008 had fairly stabilized his affective and bipolar disorders. (Tr. 67.)

The medical expert opined that Plaintiff had borderline intellectual functioning and would decompensate under moderate stress, thus limiting him to work performed in a small group setting that required only simple and unskilled instructions. (Tr. 68-70.) The medical expert further specified that Plaintiff was limited to working in groups consisting of no more than 10 people, including supervisors, and could understand, perform and carry out only simple one to two step

---

[3] A GAF rating of 31-40 equates to some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *DSM-IV*

instructions. (Tr. 71.) The medical expert also stated that Plaintiff's mental impairments would have no more than a minimal impact on his judgment and ability to respond appropriately to supervisors and co-workers. (Tr. 70-71.)

The medical expert further opined that Dr. Ryser's mental evaluation was more reflective of Plaintiff's limitations than Dr. Mount's evaluation because Dr. Ryser had more direct contact with Plaintiff. (Tr. 78-79). The medical expert stated that Dr. Mount's evaluation relied heavily on computer-generated testing models, which accounted for the imposition of more severe mental limitations. (Tr. 78-81.)

A vocational expert ("VE") testified that Plaintiff had past relevant work as an unskilled store laborer. (Tr. 73.) In addition, the VE stated that job of store laborer had a specific vocational preparation level of 2[4] ("SVP-2"). The ALJ asked the VE a hypothetical question that included an illiterate, younger individual, who is limited to working in groups consisting of no more than 10 people, including supervisors, and understanding, performing, and carrying out only simple one to two step instructions. (Tr. 71; 73). In response, the VE testified that such hypothetical person could perform Plaintiff's past relevant work as a store laborer. (Tr. 73.) The VE also testified that Plaintiff's tendency to rearrange things would be "disastrous" for jobs that require constant ordering. (Tr. 75.)

## II. ANALYSIS

*A. Standard of Review*

---

[4] Jobs at the SVP level of two require a typical worker to learn the techniques, acquire information, and develop the facility needed for average performance within anything beyond a short demonstration up to and including one month. U.S. Dep't of Labor, *Dictionary of Occupational Titles* [1009] (4th ed. 1991) (*DOT*). An SVP level of two is considered unskilled. *Social Security Ruling* 00-4p, 2000 WL189704, at *3.

A claimant must prove that he is disabled for purposes of the Act to be entitled to social security benefits. *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Act is "the inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. §404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove his disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his burden under the first four steps, the burden shifts to the Commissioner at step five to show that

9

there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan*, 38 F.3d at 236; 42 U.S.C.A. §405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not re-weigh the evidence, retry the issues, or substitute its own judgment but, rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

Having reviewed the applicable legal standards, the Court now turns to the merits of the case.

### *B. Issues for Review*

Plaintiff argues that (1) the ALJ failed to consider all of Plaintiff's vocationally significant limitations in determining residual functional capacity; (2) the ALJ improperly determined that Plaintiff has the residual functional capacity to return to his past relevant work; and (3) the ALJ improperly considered medical opinion evidence.

### *C. Step 4 Determination*

Plaintiff first contends that the ALJ's RFC determination is not supported by substantial evidence. In the alternative, Plaintiff contends that, even if substantial evidence supports the RFC determination, the ALJ erred in finding that Plaintiff retains the ability to perform his past relevant

work because the VE's testimony conflicts with the Dictionary of Occupational Titles ("DOT"). Defendant argues that no conflict exists because SVP-2 equates to unskilled work and Plaintiff is an unskilled worker. However, that all SVP-2 work is classified as unskilled does not mean all unskilled workers are capable of SVP-2 work. In this case, the ALJ specifically limited Plaintiff to simple one to two step instructions. If the SVP-2 level requires work with greater detail, Plaintiff's RFC would prevent him from performing such work.

In appropriate cases, the ALJ may give greater weight to VE testimony than to findings in the DOT. *See Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000). When a conflict is implied or indirect and did not undergo adversarial development at the administrative hearing, the testimony may be relied upon without resolving the conflict as long as the record reflects an adequate basis for doing so. *Gaspard v. Soc. Sec. Admin., Comm'r*, 609 F. Supp. 2d 607, 613 (E.D. Tex. 2009) (citing *Carey*, 230 F.3d at 146). However, when a "direct and obvious conflict" exists between the VE's testimony and the DOT and the ALJ fails to explain or resolve the conflict, the testimony is "so lessened that reversal and remand for lack of substantial evidence usually follows." *Carey*, 230 F.3d at 146; *see also Gaspard*, 609 F. Supp.2d at 613 (E.D. Tex. 2009); *Baty v. Barnhart*, 512 F. Supp.2d 881, 893-94 (W.D. Tex. 2007); *Graham v. Comm'r of Soc. Sec. Admin.*, No. 3:08-CV-2133-N, 2009 WL 3199382, at *8 (N.D. Tex. Oct. 2, 2009); *Washington v. Astrue*, No. 3:07-CV-1768-G, 2008 WL 4921675, at *6 (N.D. Tex. Nov. 14, 2008); *Lopez v. Astrue*, No. 5:07-CV-169-C, 2008 WL 1820584, at *4-5 (N.D. Tex. Apr. 23, 2008). A direct and obvious conflict exists "when the vocational expert's testimony creates a conflict or discrepancy between the ALJ's determination of the claimant's residual functional capacity and the DOT job descriptions." *Carey*, 230 F.3d at 146.

Here, the ALJ found that Plaintiff retained the ability to perform his past relevant work as a store laborer. The VE testified that an individual capable of work requiring only simple instructions could perform the job of store laborer. The VE also testified that store laborer requires an SVP of 2. (Tr. 73.) However, SVP-2 jobs require the ability to carry out detailed but uninvolved written or oral instructions. DICOT 922.687-058, 1991 WL 688132 (1991). The VE's testimony is facially different from the DOT and is therefore a direct and obvious conflict. Moreover, the ALJ failed to resolve this conflict in his decision. Because Plaintiff's RFC prevents him from performing his past relevant work, the ALJ's step 4 determination is not supported by substantial evidence.

Defendant argues that Plaintiff cannot present the conflict between the VE's testimony and the DOT as reversible error because Plaintiff's attorney representative failed to raise the alleged conflict with the VE at the hearing. The Defendant relies on *Carey*, which held that "a claimant should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Carey*, 230 F.3d at 146-47. However, *Carey*'s ruling was limited to indirect or implied conflicts. *See Baty*, 512 F. Supp. 2d at 893-94; *Graham*, 2009 WL 3199382, at *8; *Washington*, 2008 WL 4921675, at *6; *Lopez*, 2008 WL 1820584, at *4-5. In this case, the conflict is facial and apparent. Therefore, Defendant's argument is without merit. *See Romine v. Banhart*, 454 F. Supp. 2d 623, 629-30 (E.D. Tex. 2006).

Based on the foregoing, the Court finds that the case should be reversed and remanded for reconsideration. Although the Court does not find it necessary to address the Plaintiff's remaining arguments, the Court does note its concern regarding the ALJ's cursory analysis. The ALJ declined

to include explanations of how he weighed the various medical opinions and which facts he found compelling. 20 C.F.R. §404.1527 (2011). The ALJ should consider elaborating his positions upon remand.

### III. RECOMMENDATION

For the foregoing reasons, the Court hereby recommends that the Commissioner's decision be REVERSED and REMANDED for reconsideration in line with this opinion.

SO RECOMMENDED, June 10, 2011.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a true copy of these findings, conclusions, and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within fourteen days after being served with a copy. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory, or general objections. A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a de novo determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within fourteen days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).